**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| In re: | : | **Chapter 11** |
| | : | |
| **National Medical Imaging, LLC, et al.,** | : | **Case No. 20-12618(ELF)** |
| | : | |
| Debtors. | : | **Jointly Administered** |
| | : | |
| **National Medical Imaging, LLC** | : | |
| **and National Medical Imaging** | : | |
| **Holding Company, LLC,** | : | |
| | : | |
| Plaintiffs, | : | |
| | : | |
| v. | : | **Adv. No. 20-** |
| | : | |
| **U.S. Bank, National Association** | : | |
| | : | |
| Defendant. | : | |

**COMPLAINT**

National Medical Imaging, LLC ("NMI") and National Medical Imaging Holding Company, LLC ("NMIHC" and together with NMI the "Debtors" or "Plaintiffs"), by and through their undersigned counsel, file this Complaint against U.S. Bank, National Association ("U.S. Bank" or "Defendant"), for declaratory and other relief, and in support thereof allege the following:

## I.    INTRODUCTION

### A.    The Failed Chapter 7 Involuntary Petitions Against the Debtors and Rosenberg

1.    On November 7, 2008, Defendant, U.S. Bank—acting through affiliate Lyon Financial ("Lyon") and six defunct shell company affiliates (collectively, the "DVI Entities")— "artificially create[d] six creditors for the improper purpose of attempting to satisfy the provisions of Section 303(b) of the Bankruptcy Code," and filed Chapter 7 involuntary

bankruptcy petitions against the Debtors and controlling member Maury Rosenberg ("Rosenberg") in the United States Bankruptcy Court for the Eastern District of Pennsylvania. *In re Rosenberg*, 414 B.R. 826, 843 (Bankr. S.D. Fla. 2009).[1]

2.      The Chapter 7 involuntary petitions against Rosenberg and the Debtors (collectively, the "Involuntary Petitions") were each filed by the same improper petitioning creditors, signed by the same person (U.S. Bank officer Jane Fox) and were otherwise identical in all material respects.  The Bankruptcy Court for the Southern District of Florida (the "Florida Bankruptcy Court") dismissed the petition against Rosenberg with prejudice as improperly filed. *Id.*

3.      On December 29, 2009, this Court applied principles of collateral estoppel and dismissed *with prejudice* the Involuntary Petitions against the Debtors.  *In re Nat'l Med. Imaging, LLC*, 439 B.R. 837, 851-54 (Bankr. E.D. Pa. 2009).

4.      Dismissal of the petitions against the Debtors was affirmed by the District Court and the Third Circuit Court of Appeals.  *DVI Receivables XIV, LLC v. Nat'l Med. Imaging, LLC*, 529 B.R. 607, 610-16 (E.D. Pa. 2015), *aff'd sub nom.*, *Nat'l Med. Imaging, LLC v. Ashland Funding LLC*, 648 F. App'x 251 (3d Cir. 2016).

**B.      Rosenberg's Successful Claims Under 11 U.S.C. § 303(i)**

5.      In March 2013, a Florida jury found that U.S. Bank (and its affiliates) had acted in bad faith and awarded Rosenberg $1.1 million in compensatory damages and $5 million in punitive damages under Section 303(i)(2). After several rounds of appeals, Rosenberg's judgment became final in 2016.  As to Rosenberg's claim for attorneys' fees and costs under

---

[1] The Involuntary Petition against Rosenberg was transferred to Florida where he resided, and his litigation proceeded in the Florida bankruptcy, district and appellate courts.

Section 303(i)(1), the Florida Bankruptcy Court awarded millions of dollars (including so-called "fees on fees"), and the fee awards were affirmed on appeal.

### C.   Debtors' Claims Against U.S. Bank (and others) Under 11 U.S.C. § 303(i)

6.    The Debtors have been prosecuting claims under 11 U.S.C. § 303(i) against U.S. Bank and predecessor Lyon d/b/a U.S. Bank Portfolio Services, along with DVI Receivables XIV, LLC, DVI Receivables XVI, LLC, DVI Receivables XVII, LLC,  DVI Receivables XVIII, LLC, DVI Receivables XIX, LLC, DVI Funding, LLC, Ashland Funding, LLC and Jane Fox (collectively, the "§ 303(i) Defendants") for more than ten years.  This Court has stayed various aspects of the litigation pending resolution of appeals in Florida and the Debtors' litigation of their Section 303(i)(2) claims in the District Court.[2]

7.    On August 28, 2019, the District Court found sufficient evidence of bad faith to require a trial on the point and denied U.S. Bank's (and the other § 303 Defendants') motions for summary judgment as to bad faith.  The District Court, however, granted summary judgment against the Debtors on their claims for compensatory and punitive damages.

---

[2]  In accordance with the dismissal order entered by this Court, the Debtors filed a Motion for Sanctions to Award Attorneys' Fees and Costs on January 4, 2010.  *See* Bankr. No. 08-17351, D.I. 185; Bankr. No. 08-17348, D.I. 176. The request for fees and costs under 11 U.S.C. § 303(i)(1) has been supplemented over the years.  For example: on May 27, 2014, the Debtors filed adversary complaints in this Court against the § 303(i) Defendants for attorneys' fees and costs under 11 U.S.C. §303(i)(1) and Bankruptcy Rule 9011 (the "Fees and Costs Complaints").  *See* Adversary Nos. 14-00250 and 14-00251.  On May 14, 2015, the Debtors filed amended complaints in this Court, adding claims for compensatory damages and punitive damages under 11 U.S.C. §303(i)(2) (the "Damages Complaint" and collectively with the Fees and Costs Complaints, the "U.S. Bank Litigation").  By Opinion and Order dated August 31, 2016, the District Court withdrew the reference for the Debtors' §303(i)(2) claims only—to afford NMI a jury trial—and directed NMI to file an amended complaint in the District Court limited to the claims under §303(i)(2).  The Debtors filed that amended complaint on September 21, 2016, seeking compensatory and punitive damages under 11 U.S.C §303(i)(2), which was assigned Case No. 2:16-cv-05044-CMR.  While the Debtors' damage claims under 11 U.S.C §303(i)(2) are being prosecuted in the District Court, the Debtors' claims under §303(i)(1) and Bankruptcy Rule 9011 reside before this Court in Adversary Case Nos. 14-00250 and 14-00251, which encompass all claims for attorneys' fees and costs, including those for prosecuting damage claims in the District Court under Section 303(i)(2).  Finally, adjudication of the Fees and Costs Complaints before this Court have been stayed pending final determination of the Damages Complaint before the District Court.  *See* Order dated August 9, 2017, D.I. 110 in Adversary No. 14-00250 and D.I. 107 in Adversary No. 14-00251.

121569376_2

8.      On appeal—after accepting that U.S. Bank and the other § 303(i) Defendants had acted in bad faith—a panel of the Third Circuit nevertheless affirmed the District Court's decision, applying what the Debtors contend was the wrong standard of appellate review on the grant of summary judgment and the wrong legal standard for the award of punitive damages under Section 303(i)(2).

9.      The Debtors have petitioned for rehearing in the Third Circuit.[3]

10.     A group of law professors and retired bankruptcy judges as *amici curiae* have joined Debtors' request for rehearing in the Third Circuit.[4]

11.     By Order dated June 29, 2020, the Third Circuit granted the Motion for Leave to File Amici Brief on behalf of the Honorable Eugene Wedoff (Ret.), the Honorable Bruce Markell (Ret.), and a Group of Law Professors in Support of Appellant National Medical Imaging, LLC's Petition for Rehearing and Rehearing En Banc.[5]

### D.      The Involuntary Petitions Against Debtors Were Filed and Prosecuted for Thirteen Months in Bad Faith.

12.     There is a mountain of evidence establishing that the Involuntary Petitions were filed and prosecuted against the Debtors in bad faith.

13.     As the Court is well aware, the Third Circuit employs a "totality of the circumstances" approach to determine bad faith under Section 303(i), considering whether:

---

[3] A copy of the Debtors' Petition for Rehearing, along with a request that the Court take judicial notice of the filing, was docketed in this Court on June 26, 2020.  *See* D.I. 44.

[4] Copies of the Motion for Leave and Brief of *Amici Curiae* in support of the Debtors' Petition for Rehearing, along with a request that the Court take judicial notice of the filing, was docketed in this Court on June 29, 2020.  *See* D.I. 47.

[5] A copy of the Third Circuit Order, along with a request that the Court take judicial notice of the filing, was docketed in this Court on July 9, 2020.  *See* D.I. 64.

121569376_2

the creditors satisfied the statutory criteria for filing the petition; the involuntary petition was meritorious; the creditors made a reasonable inquiry into the relevant facts and pertinent law before filing; there was evidence of preferential payments to certain creditors or of dissipation of the debtor's assets; the filing was motivated by ill will or a desire to harass; the petitioning creditors used the filing to obtain a disproportionate advantage for themselves rather than to protect against other creditors doing the same; the filing was used as a tactical advantage in pending actions; the filing was used as a substitute for customary debt-collection procedures; and the filing had suspicious timing.

*In re Forever Green Athletic Fields, Inc.*, 804 F.3d 328, 336 (3d Cir. 2015).

14.     The evidentiary record from discovery taken in the Section 303(i)(2) litigation pending in the District Court established that seven of the nine *Forever Green* bad faith factors infected the Involuntary Petitions:

1) as both the Florida and Pennsylvania bankruptcy courts have held (affirmed by their respective district and circuit courts), the § 303(i) Defendants failed to satisfy the statutory criteria for filing the Involuntary Petitions under Section 303(b);

2) the Involuntary Petitions were not the least bit meritorious—so much so that the Florida Bankruptcy Court held that the § 303(i) Defendants' use of the DVI Companies "was to artificially create six creditors for the improper purpose of attempting to satisfy the provisions of Section 303(b) of the Bankruptcy Code";

3) the § 303(i) Defendants and their counsel conducted little to no inquiry into the relevant facts and pertinent law before filing the Involuntary Petitions, which was especially egregious given that counsel (Robert Pinel) had never before filed an involuntary bankruptcy petition;

4) the filing of the Involuntary Petitions was motivated by ill will and malicious intent toward Rosenberg and the Debtors or a desire to harass them, as evidenced by, *inter alia*, a September 2008 email (the "Out File Email") from Jane Fox, Director of Operations for U.S. Bank affiliate Lyon and the sole signatory of the petitions, which instructs the U.S. Bank lawyers: to behave as "street fighter[s]," not "let things just go through the [state] court systems," and "out file" Rosenberg and the Debtors;[6]

---

[6] A copy of the "Out File" Email is attached hereto as Exhibit A. This "smoking gun" document was never produced by U.S. Bank, Fox, or Lyon in any of the cases involving this dispute, even though the email was included on a privilege log as part of the involuntary bankruptcy proceedings and those parties waived the privilege by asserting an advice of counsel defense here and in the Florida litigation.

5) the § 303(i) Defendants filed the Involuntary Petitions to gain a tactical advantage in pending state court litigation because they were frustrated that the state court action was not leading to a "a quick resolution or a meaningful recovery";

6) the filings were intended as an improper debt-collection device meant to force a settlement and get The Douglas Rosenberg 2004 Trust (the "Trust"), the majority member of NMI, to pay obligations which it did not owe; and

7) the filing of the Involuntary Petitions, *after* the state court action had stalled and *after* Fox had directed the lawyers to "out file Maurey [sic]" and "not sit back and let things just go through the court systems" demonstrates suspicious timing.

## II.     **JURISDICTION AND VENUE**

15.     This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334 as a proceeding arising in, arising under, or related to the above captioned bankruptcy cases styled *In re National Medical Imaging, LLC, et. al.*, jointly administered under Case No. 20-12618-elf.  Likewise, Fed. R. Bankr. P. 7008 applies to this adversary proceeding.

16.     Plaintiffs consent to the entry of final orders or judgment by this Court in connection with all claims asserted herein.

17.     This proceeding is a "core proceeding" within the meaning of 28 U.S.C. §§ 157(b)(2)(A) (matters concerning the administration of the estate), 157(b)(2)(B) (allowance or disallowance of claims against the estate or exemptions from property of the estate, and estimation of claims or interests for the purposes of confirming a plan under chapter 11), 157(b)(2)(K) (determination of validity, extent or priority of liens), and 157(b)(2)(O) (other proceedings affecting liquidation of the assets of the estate or the adjustment of the debtor-creditor relationship).

18.     Venue of this proceeding is proper in the Eastern District of Pennsylvania pursuant to 28 U.S.C. § 1409(a).

19.     The statutory predicates for the relief requested herein are 11 U.S.C. §§ 502, 506, 510 and Fed. R. Bankr. P. 7001.

121569376_2

### III.    PARTIES

20.    Plaintiffs are Chapter 11 debtors and debtors-in-possession in the above-captioned bankruptcy proceedings.

21.    Defendant, U.S. Bank is a national association with its principal place of business in St. Paul, Minnesota.

### IV.    FACTUAL AND PROCEDURAL BACKGROUND

#### A.    The Relationships Between the Trust, the Debtors, and U.S. Bank

22.    Rosenberg is the controlling member of NMI, which provided outpatient medical imaging services.[7]  NMIH is a wholly-owned subsidiary of NMI.

23.    The Trust is also a member of NMI and it owns 99% of the membership interests.

24.    In the early 2000s, entities related to NMI (the "NMI LPs") entered into medical equipment leases with DVI Financial Services ("DVI Financial"), which then transferred the leases to DVI Funding, LLC ("DVI Funding").[8]

25.    DVI Funding held some of the leases and securitized the remainder by transferring them to various related entities with DVI Receivables (collectively, the "DVI Entities") in the name.[9]

26.    DVI Financial was the servicer of the leases until it went bankrupt, at which time Lyon acquired the servicing contracts.[10]

27.    In 2003-2004, Lyon filed multiple lawsuits in state court against NMI and its affiliates, claiming that they had defaulted under the leases.[11]

---

[7] *In re Nat'l Med. Imaging, LLC*, 439 B.R. 837, 841 (Bankr. E.D. Pa. 2009).

[8] *Rosenberg v. DVI Receivables XVII, LLC*, 835 F.3d 414, 416 (3d Cir. 2016).
[9] *Id.* at 416.

[10] *Id.* Lyon was previously a subsidiary of U.S. Bank. U.S. Bank has since become Lyon's successor by merger. References to U.S. Bank may include references to Lyon before the merger.

[11] *U.S. Bank, Nat'l Ass'n v. Rosenberg*, 581 B.R. 424, 426 (E.D. Pa. 2018), *aff'd*, 741 F. App'x 887 (3d Cir. 2018).

121569376_2

28.    In 2005, three of the DVI Entities and two other creditors filed an involuntary bankruptcy petition (the "First Involuntary Bankruptcy") against the Debtors.   The First Involuntary Bankruptcy and the Lyon lawsuits were settled in 2005 pursuant to a Settlement Agreement (the "2005 Settlement Agreement").[12]

29.    The 2005 Settlement Agreement modified the leases between the DVI Entities and the NMI LPs such that the remaining debt was owed only to Lyon.[13]

30.    As part of the 2005 Settlement Agreement, Rosenberg and the Debtors provided guaranties on the debt owed under the modified leases.

31.    As Lyon was well aware at all material times, the Trust was a secured creditor of the Debtors, but not a guarantor of the Debtors' obligations under the 2005 Settlement Agreement.

32.    The 2005 Settlement Agreement acknowledged the Trust as one of the Debtors' lenders and capped the amount of interest the Trust could receive on account of its loans to the Debtors.

**B.    The Debtors Seek to Restructure their Agreements with U.S. Bank and IBM Because of the Effects of the Deficit Reduction Act.**

33.    In 2005, Congress passed the Deficit Reduction Act ("DRA") which implemented various prospective changes to the billing of medical imaging services to Medicare patients, including substantially reduced billing rates. Recognizing that these changes would adversely affect the Debtors, in early 2008 the Debtors began discussions with their two imaging equipment lessors—IBM and U.S. Bank—about restructuring their outstanding debt due to the expected curtailment of its revenue by DRA.

34.    On January 18, 2008, Susan Verbonitz ("Verbonitz"), the Debtors' corporate counsel, reached out to Alan Winick ("Winick"), U.S. Bank's counsel who participated in the

---

[12] A true and correct copy of the 2005 Settlement Agreement is attached hereto as Exhibit B.

[13] *Id. See Nat'l Med. Imaging*, 439 B.R. at 844, 850-51 (finding that the Settlement Agreement was a novation, making Lyon/U.S. Bank the sole creditor, as the Florida bankruptcy court had found).

121569376_2

negotiation of the 2005 Settlement Agreement to start a dialogue about the Debtors' financial difficulties.

35.    In response, Winick asked Verbonitz to provide financial information and a proposal for possible restructuring.  Verbonitz provided the information requested on January 29, 2008.

36.    By letter dated March 20, 2008, Verbonitz sent another proposal for restructuring to Winick.  The following day U.S. Bank notified the Debtors of a purported event of default as a result of their failure to make monthly payments as required under the terms of the 2005 Settlement Agreement.

37.    In response to the notice of default, Verbonitz and Aris Karalis, the Debtors' bankruptcy attorney in the First Involuntary Bankruptcy, reached out to Winick in another attempt to continue restructuring discussions.

38.    Winick requested that the Debtors put together a presentation and a more detailed restructuring proposal.

39.    On April 7, 2008, Verbonitz forwarded a package of information to Winick, which included another restructuring proposal, detailed financial information including an explanation of the status of the Debtors' other debt, their most recent financial statements, and an explanation as to why the DRA had created cash flow problems. Winick emailed Verbonitz and Karalis on April 8, 2008, writing: "Nice presentation. As promised I will send it to the client and will pass on their response." The Debtors never heard back from Winick.

**C.    U.S. Bank Hires BG Management Services to Collect the Debts Owed by the Debtors**.

40.    In May 2008, U.S. Bank terminated Winick and hired BG Management Services ("BG Management") to pursue collection of the Debtors' obligations.  BG Management in turn engaged the law firm of Flamm, Boroff & Bacine ("Flamm") to handle the matter.

121569376_2

41.     It soon became clear that U.S. Bank, BG Management, and Flamm had no interest in negotiating a restructuring of the Debtors' obligations or working with the Debtors to find a realistic solution to the impact that DRA was having on their revenue.

42.     On May 29, 2008, Brier notified Rosenberg that BG Management and Flamm had been engaged. Verbonitz continued to try to work out a restructuring agreement, but U.S. Bank demanded payment of $12 million over six months.   The Debtors informed U.S. Bank's representatives that it simply could not meet this unrealistic demand. Verbonitz sent a fourth restructuring proposal to Walton on July 28, 2008, which was ignored.

**D.     U.S. Bank Confesses Judgment in Pennsylvania State Court.**

43.     On July 31, 2008, U.S. Bank confessed judgment against the NMI LPs, the Debtors, and Rosenberg in Pennsylvania state court in Bucks County (the "State Court Action").

44.     The Verification of this filing had been signed by Jane Fox the week before, on July 22, 2008.

45.     The Debtors moved to open or strike the confessed judgments.

46.     Despite the fact that the Trust had no liability for the Debtors' obligations to U.S. Bank (either as a primary obligor or guarantor), communications among U.S. Bank's representatives clearly show that U.S. Bank sought to pursue the Trust and its assets.

47.     On August 12, 2008, Brier emailed Walton asking: "Can we find out when the Maury Rosenberg Trust was created? …   If the statute hasn't expired there may be an opportunity to question the validity of the trust."

48.     On August 29, 2008, the State Court Action was stayed pursuant to a court order, and a discovery schedule was issued to resolve disputes of fact related to the confessed judgments.

**E.    Fox Directs Brier to "Out File" Rosenberg, Behave Like a "Street Fighter"
and "Not …Let Things Just Go Through the Court Systems".**

49.    As part of the State Court Action, Jane Fox—as the person who verified the complaints for the confessed judgments—was scheduled to be deposed in Philadelphia on October 1, 2008.

50.    Annoyed at having to participate in discovery in the State Court Action, Fox emailed Brier (copying General Counsel Docken), demanding that the dispute with the Debtors be handled more expeditiously.

51.    Specifically, Fox questioned whether Michael McCaney who had filed the confessed judgments was "the right attorney to be working these accounts."  Fox wrote to Brier, "I really need you to make sure that Michael is a "street fighter."  She lamented that she "ha[d] not gotten the impression that Michael understands he needs to out file Maurey [sic] [Rosenberg] and not sit back and let things just go through the court systems."

52.    Fox claimed this was necessary because Brier had told her that "Maurey [Rosenberg]…does not conduct business above the table and is know [sic] to due [sic] business i[n] rough areas" and "will pull out all legal and questionable tactics…."

53.    Taking to heart Fox's demand that they not allow the state court process to play out, Brier and Walton began exploring other ways to collect from the Debtors and Rosenberg, which included repossessing NMI's equipment, an involuntary bankruptcy petition, and an injunction.

54.    On October 28, 2008, Brier emailed Fox and Docken, copying Walton, and explained that they "were unable to reach an acceptable solution" and that "a TRO to stop [Rosenberg] from liquidating the business until a Trustee or turnaround team could be installed … would most likely not lead [sic] a quick resolution or a meaningful recovery."

55.    He then recommended: "Filing an involuntary bankruptcy using three different DVI SPE's [sic] now seems to be our best choice if it results in a liquidating Chapter 11 … [Flamm] could have it filed within the week."

121569376_2

56.     Robert Pinel ("Pinel"), who had never filed an involuntary bankruptcy petition previously, was the Flamm attorney tasked with filing the Involuntary Petitions.

57.     On November 3, 2008, Pinel emailed Brier explaining that "[t]he petition itself will take no time to prepare" but that "the filing of that petition will not put a stay in place, so it's [sic] filing will have no effect as to Maury [Rosenberg]'s ability to shut down facilities."

58.     Pinel further explained that the only way to prevent Rosenberg, as controlling member of the Debtors, from closing the centers was to apply for the appointment of an interim trustee which he could do on an emergent basis but "will take a little time to put together."

59.     Pinel then asked Brier to provide him with the three creditors to execute the Involuntary Petitions and reminded him that they would need "three signatories for each entity that we are putting into bankruptcy – maury [sic] and the two holding companies."

60.     Later that day, Pinel forwarded Brier a blank copy of the involuntary bankruptcy petition form, so that Brier could "see on the second page the information needed to go forward with filing the involuntary."

61.     On November 5, 2008, Pinel again asked Brier for the names of the petitioning creditors and noted that it was "not clear to [him] which amounts are owed to [NMI and NMIH]."

62.     In response, Brier directed Pinel to "use the same format that U.S. Bank used for each SPE in the prior bankruptcy filing" in 2005 (despite the fact that the status of the parties was changed substantially through the 2005 Settlement Agreement executed *after* the 2005 involuntary petitions were filed).

63.     The following day, Pinel sent Brier the completed Involuntary Petitions for Fox to sign.

64.     Pinel's timesheets reflect that he spent about twenty hours in total researching, reviewing all necessary documents related to the First Involuntary Bankruptcy, and preparing the three petitions.

**F.**    **The Involuntary Bankruptcy Petitions Against Rosenberg and NMI**

65.    On November 7, 2008, DVI Funding and five DVI Entities filed the Involuntary Petitions against Rosenberg and the Debtors for the debt due under the 2005 Settlement Agreement. *Rosenberg*, 835 F.3d at 416-17.

66.    Pinel was the attorney of record; Fox was the signatory for the DVI Entities, signing on behalf of Lyon as servicer.

67.    In their haste to file the Involuntary Petitions, none of the § 303(i) Defendants nor their counsel conducted any real due diligence.

68.    They did not confirm what other outstanding debts or creditors the Debtors had.

69.    They did not even verify that the DVI Entities were in fact still valid corporate entities, which in fact they were not.

70.    On November 11, 2008, prior to the Involuntary Petitions being served, Pinel emailed Brier advising that there was "little reason to seek appointment of a Trustee on an emergent basis" and "the value is in the trusts."

71.    Once again, U.S. Bank made clear that its true interest was in the Trust, which was not a creditor of U.S. Bank, and that it had little concern for the value of the Debtors' remaining imaging centers and other assets.

72.    Simply stated, the Involuntary Petitions were a collection tactic and an attempt to force a settlement funded by the Trust.

73.    The Involuntary Petition against Rosenberg (the "Rosenberg Petition") was transferred to the Florida Bankruptcy Court.

74.    The Debtors moved to dismiss the Involuntary Petitions still pending in this Court.

75.    The Debtors also brought to the court's attention that the DVI Entities' legal status had lapsed.  The § 303(i) Defendants subsequently reinstated the DVI Entities' legal status, but only after Fox had represented by signing the Involuntary Petitions that each of the DVI Entities was authorized to be a petitioning creditor (and even then only after the Debtors

had determined through a quick search of Delaware's online database for domestic corporations that they were not).

76.    In March 2009, under the weight of the Involuntary Petitions, the Debtors' business continued to suffocate; they were forced to close additional centers.

77.    On March 25, 2009, Sterling National Bank ("Sterling"), a lender that held collateral related to NMI's accounts receivable, notified NMI that it was in default due to the filing of the Involuntary Petitions that remained pending thirty days after they were filed. Sterling asked for additional collateral from NMI because of the pending Involuntary Petitions, which led to a forbearance agreement between NMI and Sterling.

78.    On April 10, 2009, Involuntary Petitions were again amended, substituting Ashland as a petitioner.

79.    The parties engaged in extensive discovery and motion practice related to the Involuntary Petitions. At the same time, the Debtors tried to keep operations running but continued to close imaging locations in an attempt to keep the other centers going.

80.    On August 21, 2009, the Florida Bankruptcy Court dismissed the Rosenberg Petition as improperly filed because it did not meet the statutory requirements of 11 U.S.C. § 303(b).    *In re Rosenberg*, 414 B.R. 826, 843, 848 (S.D. Fla. 2009).

81.    As the Florida Bankruptcy Court explained:

> Section 303(b) of the Bankruptcy Code sets forth both quantitative and qualitative requirements for filing an involuntary petition, namely: (1) the petition must be brought by not less than three eligible creditors, unless there are not more than eleven eligible creditors (after reduction for the specified excluded creditors), and (2) the claims of the petitioning creditors must not be subject to "bona fide dispute".

*Id*. at 843 (*citing In re Compuhouse Sys., Inc.*, 168 B.R. 305 (Bankr. W.D. Pa. 1994), *rev'd on other grounds*, 179 B.R. 474 (W.D. Pa. 1995)). The Florida Bankruptcy Court recognized that there was only one real petitioning creditor and that the DVI Entities were included to reach the numerosity requirement.

82.    The court explained that the DVI Entities were not creditors of Rosenberg under the 2005 Settlement Agreement and, therefore, did not have standing to file the Involuntary Petition against him. *Id.* at 840-43. Instead, the 2005 Settlement Agreement constituted a novation of the original obligations between the parties and only Lyon could be considered a creditor under the agreement. *Id.* at 844, 848.

83.    The court noted that when Fox was asked why Lyon obtained the confessed judgments in state court, but the DVI Entities were the petitioning creditors, Fox "testified that she did not have an explanation" for this inconsistency. *Id.* at 842-43.

84.    As the Florida Bankruptcy Court recognized, the only explanation for the § 303(i) Defendants filing the Rosenberg Petition using the DVI Entities "was to artificially create six creditors for the improper purpose of attempting to satisfy the provisions of Section 303(b) of the Bankruptcy Code." *Id.* at 843. In addition, the Florida Bankruptcy Court recognized that the "claim" or debt Rosenberg owed was both contingent and subject to a *bona fide* dispute as evidenced by the already ongoing State Court Action. *Id.* at 844. For all of these reasons, the Florida Bankruptcy Court found that the Rosenberg Petition did not meet the statutory criteria outlined in Section 303(b) and, therefore, dismissed it with prejudice. *Id.* at 848.

85.    On August 26, 2009, the § 303(i) Defendants amended the Involuntary Petitions against the Debtors a third time.

86.    In November 2009, with the Involuntary Petitions pending, the Debtors closed their last location and ceased operating.

87.    On December 28, 2009, thirteen months after they had been filed, this Court dismissed the Involuntary Petitions—giving collateral estoppel effect to the Florida Bankruptcy Court's decision. *Nat'l Med. Imaging*, 439 B.R. at 851-54.

88.    Both bankruptcy courts' decisions were affirmed on appeals to their respective district courts and circuit courts. *See In re Rosenberg*, 472 F. App'x 890 (11th Cir. 2012) (affirming District Court's Order affirming Bankruptcy Court's decision); *DVI Receivables XIV*, 529 B.R. at 627; *Nat'l Med. Imaging*, 648 F. App'x  at 252.

**G.    U.S. Bank's Judgment**

89.    After its confessed judgments were opened, U.S. Bank continued the State Court Action, eventually obtaining a judgment against the Debtors on a guaranty for $12,000,000.00 (and with interest now approximately $15 million) in May 2015 (the "U.S. Bank Judgment").

90.    After taking no action for years, U.S. Bank domesticated its judgment in Florida, and in July 2019, issued writs of execution against the Debtors in Florida, where the Debtors had no assets and had never operated.

91.    As U.S. Bank was well-aware, the Debtors are Pennsylvania entities whose only assets consist of causes of action under Section 303(i) of the Bankruptcy Code being litigated in this Court and the District Court for the Eastern District of Pennsylvania.

92.    U.S. Bank then sought Florida state court approval to sell the Debtors' choses of action, i.e., the Debtors' Section 303(i)(2) claims.

93.    Despite the fact that a state court generally does not have jurisdiction over litigation pending in a foreign jurisdiction, and execution on choses of action is generally contrary to Florida law, the Florida state court ordered the sale of the Section 303(i)(2) claims at a public sale scheduled for June 15, 2020.  *See, e.g.*, Fla. Stat. § 56.061 (listing what property is subject to execution and levy, but omitting choses in action); *see Peninsula State Bank v. U.S.*, 211 So. 2d 3, 6-7 (Fla. 1968) (recognizing that contractual rights and choses in action are not subject to levy and sale through execution, nor to the lien of an execution); *Harris v. Smith*, 7 So. 2d 343, 346 (Fla. 1942) (choses in action are subject to execution only when permitted by statute or when they are voluntarily given up for sale); *see also Willard v. Petruska*, 402 F.2d 756, 756-57 (5th Cir. 1968) (under Florida law, an execution lien does not attach to choses in action and other intangible property).

94.    Had the Debtors stood down, U.S. Bank would have proceeded with the auction and credit bid to "purchase" the Section 303(i)(2) causes of actions with the sole purpose of ending the litigation against itself and the other § 303(i) Defendants, obliterating one of the Debtors' two significant assets, and circumventing the Bankruptcy Code and underlying policy "that a bad faith judgment pursuant to Section 303(i) 'cannot be permitted to be set off against

the unsuccessful petitioning creditor's claims against the Debtor.'" *U.S. Bank, Nat'l Ass'n v. Rosenberg*, 581 B.R. 424, 430 (E.D. Pa.), *aff'd,* 741 F. App'x 887 (3d Cir. 2018).

95.    U.S. Bank telegraphed its intent to repeat the scheme by auctioning and acquiring the Debtors' pending claims in this Court against the § 303(i) Defendants (including itself) under Section 303(i)(1), upon which U.S. Bank intended terminate that litigation as well.

96.    U.S. Bank has asserted in pleadings filed with this Court the meritless claim that it may be a secured creditor.

97.    Its claim arises from the U.S. Bank Judgment, and there has been no levy on the U.S Bank Judgment that could give rise to a lien against any of the Debtors' assets.

98.    At best, the U.S. Bank Judgment is a general unsecured claim, though it is precluded as a matter of law from sharing in any distribution of the Debtors' Section 303(i) recovery under the public policy and no-setoff principles underlying Section 303(i).[14]  *See U.S. Bank v. Rosenberg*, 2018 WL 3640987 (3d Cir. July 31, 2018); *see also In re Macke Int'l Trade, Inc.*, 370 B.R. 236, 255 (B.A.P. 9th Cir. 2007) ("The consensus of courts is that a setoff of this sort is impermissible."); *In re Diloreto*, 442 B.R. 373, 377 (E.D. Pa. 2010) ("the allowance of a setoff right would severely weaken the purpose of 303(i)"); *In re Forever Green Athletic Fields, Inc.*, No. 12-13888-MDC, 2017 WL 1753104, at *7 (Bankr. E.D. Pa. May 4, 2017) (adopting *Macke*'s reasoning to deny setoff of a § 303(i) award); *In re K.P. Enter.*, 135 B.R. 174, 185-86 (Bankr. D. Me. 1992) (denying setoff of a § 303(i) award because setoff would "blunt" the policies underlying § 303(i)); *In re Schiliro*, 72 B.R. 147, 149 (Bankr. E.D. Pa. 1987) ("[A]n award pursuant to § 303(i) should not and cannot be permitted to be set off against the unsuccessful petitioning creditor's claims against the Debtor"); 2 *Collier on Bankruptcy* ¶ 303.33[8] (16th ed. 2018) ("[S]etoff would undermine the goals of section 303(i)").

---

[14] In the unlikely event that the U.S. Bank Judgment is determined to be a secured claim, this legal prohibition would also apply to prevent U.S. Bank from sharing in any recovery from these claims.

121569376_2

99.    Based on these well-established equitable principles, U.S. Bank's unsecured claim under any plan proposed by the Debtors must be (a) separately classified from the claims of all other creditors, (b) identified as junior in priority to all other classes of claims and interests, and (c) prohibited from sharing in the proceeds of its misconduct.

100.    Rather than reward creditors like U.S. Bank who filed sham involuntary bankruptcy petitions in bad faith, the proceeds from the Debtors' successful prosecution of their claims under Section 303(i) should be shared solely by the Debtors' other creditors (and interest holders if the proceeds are sufficient to pay all other creditors in full) under a liquidating plan in accordance with the priorities of the Bankruptcy Code.

### H.    The Debtors' Voluntary Bankruptcy Petitions

101.    On June 12, 2020 (the "Petition Date"), the Debtors filed for voluntary bankruptcy relief under Chapter 11.

102.    The Debtors' Chapter 11 filings were necessary to stop U.S. Bank from attempting to bypass federal bankruptcy policy precluding creditors from setting off debts against their liability under Section 303(i).[15]

103.    With the strike of an auctioneer's gavel, U.S. Bank sought to end 12 years of federal court litigation against it, immunize itself against liability under Section 303(i), and wipe out the value of the Debtors' remaining assets.

104.    Such an inequitable result would have bestowed a windfall upon U.S. Bank at the expense of the Debtors, their creditors and estates.

### I.    U.S. Bank's Post-Petition Actions

---

[15] This is not the first time that U.S. Bank has attempted to circumvent the Bankruptcy Code and underlying policy in matters involving the Debtors and Rosenberg. After obtaining judgment against Rosenberg for $6.5 million, U.S. Bank asked the District Court to permit mutual satisfaction of this judgment and Rosenberg's $6.1 million judgment against the § 303(i) Defendants through legal setoff. The District Court denied this request, and the Third Circuit affirmed, on the basis that federal courts "generally find that a bad-faith judgment pursuant to § 303(i) 'cannot be permitted to be set off against the unsuccessful petitioning creditor's claims against the Debtor.'" *U.S. Bank, Nat'l Ass'n v. Rosenberg*, 581 B.R. 424, 430 (E.D. Pa.), *aff'd,* 741 F. App'x 887 (3d Cir. 2018).

121569376_2

105.    Within seven days of the Petition Date, U.S. Bank filed a motion to dismiss the Debtors' bankruptcy cases (the "Motion to Dismiss")—continuing the "Out File" and "Street Fighter" strategies that it implemented many years ago.  D.I. 25.

106.    U.S. Bank seeks dismissal of these bankruptcy cases to, *inter alia*, allow it to resurrect its strategy to bypass liability under Section 303(i)(2) by credit bidding and acquiring the claims through a judicial sale, substituting itself as the plaintiff and terminating the litigation and its liability under Section 303(i)(2).[16]

107.    U.S. Bank suggests that the Debtors cannot confirm a plan in these bankruptcy cases—asserting that if the U.S. Bank Judgment is treated as an unsecured creditor under the Debtors' plan, it will control the unsecured class and vote against the plan.  *See* Motion to Dismiss ¶ 98.

108.    At the same time, U.S. Bank also suggests that the U.S. Bank Judgment is secured by the Debtors' Section 303(i) claims, and that this secured claim somehow has priority over the claims of the law firms that performed the work for which fees and costs are due under Section 303(i)(1).  *See* Motion to Dismiss ¶ ¶ 9, 70.

109.    U.S. Bank provides no support for its allegation that it holds a secured claim in the Debtors' Section 303(i) claims—and the law provides none.

110.    U.S. Bank also alleges that its mislabeled secured claim will frustrate the Debtors' ability to achieve a "cram-down." *See* Motion to Dismiss, ¶ 99.[17]

111.    Simply stated, U.S. Bank's half-hearted assertion that it has a secured claim in these bankruptcy cases is without basis in law or fact, and the Debtors dispute it.

---

[16] Notably, this tactic would do far more than effectuate a setoff of the U.S. Bank Judgment against U.S. Bank's liability to the Debtors under Section 303(i).  Not only would it eliminate any liability that U.S. Bank has to the Debtors **above** the current amount of the U.S. Bank Judgment, it would also eliminate the liability of the other § 303(i) Defendants—even though they do not hold any claims against the Debtors.

[17] In making this argument, U.S. Bank conveniently ignores the fact that secured creditors are generally classified separately from other secured creditors to the extent they have different priorities in the same collateral or claims secured by differing collateral.

121569376_2

112.    In its Motion to Dismiss, U.S. Bank posits that its claim is unassailable in this Court because it derives from a final judgment in state court.  *See* Motion to Dismiss, ¶ 98.

113.    U.S. Bank's emphasis on the finality of its judgment against the Debtors misses the point.

114.    The Debtors' assets in these bankruptcy cases consist solely of their claims under Section 303(i) against the § 303(i) Defendants (including U.S. Bank), and the equitable principles underlying Section 303(i) unquestionably preclude U.S. Bank from sharing in any proceeds from those claims.

115.    Within 27 days of the Petition Date, U.S. Bank filed a motion for relief from stay (the "Motion for Relief") to continue litigating appeals by the Debtors pending in Florida that relate to underlying litigation commenced by U.S. Bank against the Debtors, including the pre-petition litigation that authorized the judicial sale of the Debtors' Section 303(i)(2) claims.  D.I. 65.

116.    In its Motion for Relief, U.S. Bank asserts that the U.S. Bank Judgment is secured by an equitable lien.  *See* Motion for Relief, ¶ 18.  It provides, however, no factual or legal basis or any explanation at all for its purported equitable lien.  That is because there is none.

117.    In short, the principles underlying Section 303(i)—including that precluding setoff—prohibit U.S. Bank from sharing in the proceeds of the Debtors' recovery against the § 303(i) Defendants (including U.S. Bank).

## V.    CLAIMS FOR RELIEF

### FIRST CLAIM - DECLARATORY JUDGMENT

118.    Paragraphs 1-117 above are incorporated herein by reference, as if restated in their entirety.

119.    In a case of actual controversy within its jurisdiction, except with respect to certain inapplicable exceptions, any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought.  28 U.S.C. § 2201(a).  Any such

declaration shall have the force and effect of a final judgment or decree and shall be reviewable as such. *Id.*

120.    An actual case or controversy exists here because, *inter alia*, (a) Defendant asserts claims against or an interest in the Debtors' pending Section 303(i) claims and the proceeds thereof, (b) Defendant erroneously alleges that (i) it has an equitable lien against the Section 303(i) claims and the proceeds thereof, (ii) it has prior rights to the Section 303(i) claims and the proceeds thereof, (iii) it may setoff against any Section 303(i) judgment in favor of Plaintiffs, the amount that Plaintiffs owe to Defendant under the U.S. Bank Judgment, (iv) it has the right to levy on the Section 303(i) claims and purchase such claims at a judicial sale with the intent to take over the Section 303(i) litigation and shut it down, and (v) its claim is entitled to be classified in the same class as other similarly situated creditors, notwithstanding the equitable principles underlying Section 303(i) and its having in bad faith instituted and prosecuted sham Involuntary Petitions against the Debtors, the very misconduct that underlies the Debtors' claims under Section 303(i).

121.    Plaintiffs seek judgment in their favor declaring, *inter alia*, that:

(a)    Defendant U.S. Bank is prohibited from sharing in the proceeds of Debtors' Section 303(i) claims against the § 303(i) Defendants (including U.S. Bank);

(b)    Defendant U.S. Bank is prohibited from setting off (or crediting) its claim in these bankruptcy cases or the underlying U.S. Bank Judgment against U.S. Bank's liability to the Debtors under Section 303(i);

(c)    Defendant U.S. Bank is prohibited from taking any action to interfere with the Debtors' prosecution of their claims under Section 303(i), provided, however, that U.S. Bank shall be permitted to defend against those claims but only in the forum(s) in which they are prosecuted;

(d)    U.S. Bank's claim shall not receive any distribution, payment or setoff from or against the Section 303(i) claims and proceeds paid to the Debtors' estates in connection

therewith, or any subsequent distribution such proceeds to the law firms who did the work that comprise the fees and costs asserted under Section 303(i)(1), or any other creditors of the Debtors' estates, or if applicable, any holders of interests in the Debtors; and,

(e)     under any plan proposed by the Debtors, U.S. Bank's claim (regardless of whether it is determined to be secured or unsecured) must be (i) separately classified from the claims of all other creditors, (ii) identified as junior in priority to all other classes of claims, and (iii) prohibited from sharing in any recovery from the Debtors' Section 303(i) claims, even if such recovery is sufficient to pay all the Debtors' other creditors in full.

## SECOND CLAIM - DETERMINATION OF EXTENT, PRIORITY AND VALIDITY OF ALL LIENS

122.   Paragraphs 1-121 above are incorporated herein by reference, as if restated in their entirety.

123.   In this proceeding, Plaintiffs seek a final determination as to the extent, priority and validity of the liens asserted by Defendant U.S. Bank in the assets of the Debtors, including Debtors' Section 303(i) claims and the proceeds thereof.

124.   Defendant U.S. Bank claims an equitable lien in the Debtors' Section 303(i)(2) claims (and the proceeds thereof) and at times suggests that such lien and rights also attach to the Debtors' Section 303(i)(1) claims (and the proceeds thereof).

125.   Plaintiffs dispute the validity of the Defendant's alleged lien and security interests in the Plaintiffs' assets including, Debtors' Section 303(i) claims and the proceeds thereof.

126.   As a matter of law, a wrongdoer who is liable under Section 303(i)—the status occupied by U.S. Bank—is prohibited from asserting a claim against or interest in the proceeds derived by its misconduct.

## THIRD  CLAIM – EQUITABLE SUBORDINATION

127.   Paragraphs 1-126 above are incorporated herein by reference, as if restated in their entirety.

128.   Under 11 U.S.C. § 510(c)(1), "A bankruptcy court may, 'under principles of equitable subordination, subordinate for purposes of distribution all of part of an allowed claim to all or part of another allowed claim …." *O'Halloran, Chapter 11 Trustee v. Prudential Savings Bank (In re Island* View *Crossing II, L.P.)*, 604 B.R. 181, 202 (Bankr. E.D. Pa. 2019).

129.   In the Third Circuit:

Equitable subordination of a claim is proper when:

(1) the claimant engaged in some type of inequitable conduct;

(2) the misconduct resulted in injury to the creditors or conferred an unfair advantage on the claimant; and

(3) equitable subordination of the claim is consistent with the provisions of the Bankruptcy Code.

*In re Island View*, 604 B.R. at 202 (*quoting In re Winstar Commc'n, Inc.*, 554 F.3d 382, 411–12 (3d Cir. 2009)); *Citicorp Venture Capital, Ltd. v. Comm. of Unsecured Creditors*, 160 F.3d 982, 986-87 (3d Cir.1998).

130.   Moreover:

A non-insider [such as Defendant U.S. Bank] can be subordinated even if he or she did not specifically commit "fraud, spoliation or overreaching" – these are just helpful examples, repeatedly referenced in the case law, of the "more egregious" conduct necessary for subordination. Any "'very substantial' misconduct involving 'moral turpitude **or** some breach of duty **or** some misrepresentation whereby other creditors were deceived to their damage'" can justify subordination.

*** 

… the enforcement of a contract can inch over into inequitable conduct.

*In re Island View*, 604 B.R. at 203 (emphasis added, citations and footnote omitted).

131.   The inequitable conduct of Defendant U.S. Bank is set forth in detail above and it includes, among other wrongdoing:

(a)  Filing and prosecuting in bad faith sham Chapter 7 Involuntary Petitions against the Debtors for many months after the substantially similar Rosenberg Petition was dismissed with prejudice by the Florida Bankruptcy Court;

(b)  Fabricating six petitioning creditors for the improper purpose of attempting to satisfy the numerosity provisions of Section 303(b) of the Bankruptcy Code and misrepresenting that status on petitions signed under penalty of perjury in the bankruptcy court;

(c)  Filing and prosecuting Involuntary Petitions that were motivated by ill will and malicious intent toward Rosenberg and the Debtors or a desire to harass them, as evidenced by, *inter alia*, the Out File Email from Jane Fox, Director of Operations for U.S. Bank affiliate Lyon and the sole signatory of the petitions, which instructs U.S. Bank's lawyers: to behave as "street fighter[s]," not "let things just go through the [state] court systems," and "out file" Rosenberg and the Debtors;

(d)  Filing and prosecuting Involuntary Petitions to gain a tactical advantage in pending state court litigation because it was frustrated that the state court action was not leading to a "a quick resolution or a meaningful recovery";

(e)  Filing and prosecuting Involuntary Petitions as an improper debt-collection device meant to force a settlement and get the Trust, the majority member of NMI, to pay obligations which it did not owe; and,

(f)  Misusing Florida state-court process in a scheme to execute on the Debtors' Section 303(i)(2) claims and shut down the litigation against itself and the other § 303(i) Defendants—to the substantial detriment of the Debtors' other creditors and in callous disregard for the equitable principles underlying Section 303(i).

132.  As a result of the wrongdoing of the Defendant, all creditors of the Debtors have been injured and the Defendant has obtained an unfair advantage over those creditors.

121569376_2

133.    Given the willful, egregious, unfair, and bad faith inequitable conduct of Defendant U.S. Bank, equitable subordination for all claims and to all creditors is consistent with provisions of the Bankruptcy Code.

134.    Accordingly, any and all claims of Defendant U.S. Bank—including claims heretofore or hereafter filed—against the Debtors should be equitably subordinated below the rights of all other creditors of the Debtors, pursuant to 11 U.S.C § 510 of the Bankruptcy Code.

## VI.    <u>RELIEF REQUESTED</u>

WHEREFORE, Plaintiffs, National Medical Imaging, LLC and National Medical Imaging Holding Company, LLC, demand judgment in their favor and against Defendant, U.S. Bank:

(a)    For declaratory relief as requested in the First Claim;

(b)    For a determination as to the extent, priority and validity of the liens asserted by Defendant U.S. Bank, as requested in the Second Claim;

(c)    For equitable subordination as requested in the Third Claim;

(d)    For the award of attorneys' fees and costs under 11 U.S.C § 303(i) as relates to Defendant U.S. Bank's improper scheme to obliterate the Debtors' claims under Section 303(i); and

(e)    For the award of such further relief as this Court deems just.

Dated: July 20, 2020                    **KAUFMAN, COREN & RESS, P.C.**


By: _/s/ Steven M. Coren_____
STEVEN M. COREN
Two Commerce Square, Suite 3900
2001 Market Street
Philadelphia, PA 19103
Tel: (215) 735-8700
scoren@kcr-law.com
*Special Counsel for Plaintiffs*

**KARALIS PC**

121569376_2

By:  /s/ Aris J. Karalis
ARIS J. KARALIS
ROBERT W. SEITZER
1900 Spruce Street
Philadelphia, PA  19103
(215) 546-4500
akaralis@karalislaw.com
rseitzer@karalislaw.com
*Special Counsel for Plaintiffs*

121569376_2